UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| WILLI FREE  I GARNER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-259 |
| | § | |
| KELLY  METZ, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this prisoner civil rights action, Plaintiff Willi Free I Garner claims that Defendant Captain Kelly Metz's used excessive force against him on June 29, 2012, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Pending is Defendant Metz's motion for summary judgment to dismiss Plaintiff's claim for failure to state a constitutional violation, or in the alternative, on the grounds that he is entitled to qualified immunity because his actions were objectively reasonable.  (D.E. 36).  Plaintiff has filed a response in opposition.  (D.E. 41).  For the reasons stated herein, it is respectfully recommended that the Court grant Defendant's motion for summary judgment and dismiss with prejudice Plaintiff's excessive force claim.

## I.    JURISDICTION.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.    PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and he is currently confined at the Diboll Unit in Angelina, Texas, although his complaint concerns events that occurred while he was housed at the McConnell Unit in Beeville, Texas.  He filed his original complaint on August 19, 2013, and named the following three individuals as Defendants: (1) Captain Kelly Metz; (2) Major Adam Gonzales; and (3) Lanelle White-Roell, L.V.N.  (D.E. 1 at 3).  Plaintiff claimed that on June 29, 2012, Captain Kelly used excessive force against him, that Major Gonzales effectively encouraged the unauthorized use of force (UOF) and/or failed to protect him, and that Nurse White-Roell failed to provide appropriate medical treatment following the UOF.  (D.E. 1, p. 3).  Following a November 21, 2013 *Spears*[1] hearing, Plaintiff's claims for monetary damages against all Defendants in their official capacities were dismissed as barred by the Eleventh Amendment, and his claims against Major Gonzales and Nurse White-Roell were dismissed for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).  (D.E. 16).  Plaintiff's excessive force claim against Defendant Metz was retained and service ordered on this Defendant in his individual capacity.  (D.E. 16, D.E. 17).

On January 31, 2014, Defendant filed his Answer and raised the defense of qualified immunity.  (D.E. 18).

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

On June 6, 2014, Defendant filed a Motion to Dismiss pursuant to 28 U.S.C. § 1915(g) because Plaintiff had attained three strikes.  (D.E. 24).  It was recommended that Defendant's motion to dismiss be denied because the allegedly qualifying "strikes" arose after Plaintiff had filed suit and service had been ordered on Defendant (D.E. 29), and on October 30, 2014, the Court adopted the recommendation and denied Defendant's motion to dismiss.  (D.E. 32).

Following an extension of time (D.E. 35), on February 5, 2015, Defendant filed the instant motion for summary judgment.  (D.E. 36, 38).

On March 30, 2015, Plaintiff filed his response in opposition.  (D.E. 41).

## III.    SUMMARY JUDGMENT EVIDENCE.

In support of his motion for summary judgment, Defendant Metz offers the following:

Ex. A:      Plaintiff's grievance records from April 2012 through December 2012 (D.E. 36-1, pp. 2-12);

Ex. B:      Plaintiff's TDCJ medical records from January 1, 2012 through December 31, 2012 (D.E. 38, pp. 2-61) (filed under seal);

Ex. C:      Plaintiff's Offense Report records from January 2012 through December 2012 (D.E. 36-2, pp. 2-7);

Ex. D:      Affidavit of Kathryn Bell, TDCJ Administrative Monitor for Use of Force (D.E. 36-3, pp. 1-2); and

Ex. E:      TDCJ Offender Orientation Handbook (D.E. 36-4, pp. 2-22).

The summary judgment evidence establishes the following:

### (1)  The June 29, 2012 incident and Plaintiff's medical records.

Sometime in 1998, Plaintiff was involved in an altercation in which he was seriously injured, necessitating *inter alia*, cervical surgery in which certain vertebrae were fused.  (D.E. 1, p. 7).  He is partially disabled, experiences chronic pain, and is restricted to perform sedentary work only.  (D.E. 1, p. 7).  Because of his neck restriction and pain, Plaintiff has a medical pass allowing him to wear a front-zipper shirt as opposed to the regular pull-over prison shirt.  (D.E. 1, p. 6).

On June 29, 2012, Plaintiff went to pick-up his legal mail, passing through several gates and checkpoints, as well as walking past Captain Metz without incident.  (D.E. 1, p. 4).  In the mail room, Major Gonzales angrily approached Plaintiff and ordered him to tuck his shirt into his pants, stating that, just because Plaintiff had won his quarter-inch beard lawsuit,[2] he was still required to follow all other prison rules.[3]  (D.E. 1, p. 7). Plaintiff responded that he was wearing the front-zipper shirt for medical reasons.  (D.E. 1, p. 7).  Major Gonzales left; however, Plaintiff noticed him talking with Defendant Metz and pointing at Plaintiff.  (D.E. 1, p. 7).  As Plaintiff left the mail room and entered the Gate 1 area, Defendant Metz ordered Plaintiff to tuck in his shirt.  (D.E. 1, p. 8). Plaintiff briefly tried to explain his medical condition and that his neurologist had recommended that the shirt be worn un-tucked.  (D.E. 1, p. 8).  Defendant asked Plaintiff

---

[2] *See Garner v. Morales*, Case No. 2:06-cv-218 (in which Plaintiff successfully challenged the TDCJ's no-beard grooming policy under RLUIPA and was given permission to wear a quarter-inch beard).

[3] TDCJ Regulations require that: "Male offenders will wear their shirttails tucked inside their pants."  (D.E. 36-4, p. 22).

if he had a medical pass to wear the front-zipper shirt un-tucked and Plaintiff responded that he had numerous medical passes to accommodate his disability, including the front-zipper shirt, a cervical collar, and a double cuff/front hand-cuff pass, but that he did not have a specific lay-in to wear the front-zipper shirt un-tucked; however, it had never been a problem until today.  (D.E. 1, pp. 8-9).  Defendant asked if Plaintiff was refusing to tuck his shirt in, and Plaintiff stated that he was so refusing.  (D.E. 1, p. 9).

Defendant told Plaintiff he was going to write him a disciplinary case for refusing to follow an order, creating a disturbance, and threatening an officer, and that he would be escorted to medical and then to pre-hearing detention (PHD).  (D.E. 1, p. 10).  Plaintiff was then placed in double handcuffs behind his back, in violation of his medical restrictions.  (D.E. 1, p. 10).  Plaintiff claims it is at this time, that Defendant used his body weight to "slam Plaintiff into the steel fence pole,"  and that he twice quickly banged Plaintiff=s forehead against the pole while telling Plaintiff not to resist.  (D.E. 1, pp. 10-11).  Thereafter, Lieutenant Todd escorted Plaintiff to medical.  (D.E. 1, p. 11).

Plaintiff was seen in the infirmary at 10:20 a.m. for a required PHD health evaluation.  (D.E. 38, pp. 49-51).  It was noted that Plaintiff's regular medications included Prevastatin, Simethicone for gas, Tolnaftate anti-fungal cream, and a fiber supplement.  (D.E. 38, p. 49).  His general appearance was "clean" and under "skin" it was noted that Plaintiff had no lacerations, contusions, or bruises.  (D.E. 38, pp. 49-50).  His breath sounds were clear and regular, and his heart rhythm was regular.  (D.E. 38, p. 50).  He had no nausea or vomiting, and no headache or dizziness.  (D.E. 38, p. 50).  Plaintiff's speech was normal, his pupils were equal and reactive, and he was oriented to

person, place and time.  (D.E. 38, p. 51).  His thought processes were organized and logical, his emotional state was noted to be "social," and he had no suicidal ideations. (D.E. 38, p. 51).  He was found to need no further evaluations and was released to security.  (D.E. 38, p. 51).  The medical report was signed by Nurse Moreno and Dr. Whitt.  (D.E. 38, p. 51).

According to Plaintiff, after being placed in PHD, Major Castro ordered that he be released that same day and that no disciplinary case be filed against him.  (D.E. 1, p. 12). Plaintiff was not charged with a disciplinary case for the June 29, 2012 incident.  (*See* D.E. 36-2, pp. 3-7, copies of Offense Reports filed between January 1, 2012 through December 31, 2012; there is no Offense Report for June 29, 2012 filed by Defendant Metz against Plaintiff for creating a disturbance, threatening an officer, or refusing to obey an order).

Upon his release from PHD, Plaintiff claims that he returned to the infirmary complaining of a headache and seeing spots, and that Nurse White-Roell told him to submit a Sick Call request (SCR).  (D.E. 1, p. 13).  There is no medical record of Plaintiff returning to the infirmary on June 29, 2012 following his PHD evaluation.  (*See* D.E. 38).

On July 20, 2012, Plaintiff filed a SCR requesting a new cervical collar.  (D.E. 38, p. 44).

On July 23, 2012, Plaintiff reported to the infirmary for evaluation of a cervical collar replacement.  (D.E. 38, p. 12).  Physician's Assistant Echavarry noted that Plaintiff's current cervical collar was old and stated that he would check with Ms. Clark about getting Plaintiff a replacement collar.  (D.E. 38, p. 12).

On October 4, 2012, Plaintiff was seen at the McConnell Unit infirmary for his annual physical examination.  (D.E. 38, pp. 31-33).  His regular medications were noted to be Prevastatin, Simethicone, and a fiber supplement.  (D.E. 38, p. 31).  Under "head and neck" it was noted that he had degenerative joint disease with cervical spine fusion.  (D.E. 38, p. 31).  His vision was blurry, even with glasses.  (D.E. 38, p. 31).  He had a runny nose, due to sinus problems, and a broken tooth.  (D.E. 38, p. 31).  Plaintiff complained of having diarrhea two to three times a week and that he sometimes had difficulty swallowing.  (D.E. 38, p. 31).  Concerning his lower extremities, Plaintiff complained of nightly leg cramps and varicose veins bilaterally were noted.  (D.E. 38, p. 31).  His diagnoses were: degenerative joint disease of the cervical spine, hyperlipidemia, and varicose veins.  (D.E. 38, p. 32).  His permanent restrictions included a lower bunk, ground floor, and no lifting over 50 pounds.  (D.E. 38, p. 32).  Nurse Practitioner Hudson ordered lab work, a flu vaccine, TED hose for Plaintiff's varicose veins and prescribed Loperamide to treat the diarrhea symptoms.  (D.E. 38, p. 32).  Plaintiff was also advised to submit an I-60 to Dental.  (D.E. 38, p. 31).  Plaintiff refused a prostate examination.  (D.E. 38, p. 4).

On October 8, 2012, Plaintiff filed an I-60 requesting to be seen by Dental and he was scheduled for an appointment the next day.  (D.E. 38, p. 23).  On October 9, 2012, Plaintiff was seen by the dentist, Dr. Ferrell.  (D.E. 38, pp. 20-22).  Dr. Ferrell's assessment was hard tissue disease and his plan was to restore tooth #31 and to prescribe a pre-rinse for daily use.  (D.E. 38, p. 20).

On October 24, 2012, Plaintiff's blood work revealed that his cholesterol continued to be high, but his triglycerides were within the normal range.  (D.E. 38, p. 36). Plaintiff's Prostatic Specific Antigen (PSA) was well within normal range.  (D.E. 38, p. 34).

On October 25, 2012, Plaintiff filed a SCR asking that his front-cuff pass and zipper-shirt pass be renewed.  (D.E. 38, p. 43).   These passes were renewed for six months.  (D.E. 38, p. 43).

On December 3, 2012, Plaintiff was seen in the infirmary by Dr. Whitt for follow-up care of his hyperlipidemia.  (D.E. 38, pp. 5-7).  Plaintiff admitted that he had not been taking his Prevastatin because it had a "foul taste."  (D.E. 38, p. 6).  Dr. Whitt's plan was to discontinue the Prevastatin and start Plaintiff on Lopid.  (D.E. 38, p. 6).  She ordered blood work to correspond with his next annual examination.  (D.E. 38, p. 6).

### (2)     Step 1 and Step 2 grievances related to the June 29, 2012 incident.

On June 29, 2012, Plaintiff filed a Step 1 grievance, Grievance No. 2012189772, concerning the June 29, 2012 UOF.  (D.E. 36-1, pp. 3-4).  Plaintiff alleged that Defendant Metz used his body weight to slam him into the fence, used his hand to bang Plaintiff's head against the steel pole, and that "the force from the impact caused a knot to swell on my forehead."  (D.E. 36-1, p. 4).  He also alleged that Major Gonzales and Captain Metz had falsified Offense Reports against him for creating a disturbance, threatening an officer, and refusing to obey an order.  (D.E. 36-1, p. 4).  Finally, he claimed that the medical attention he received was "cursory" and that he had been instructed to submit a SCR for non-aspirin when he got to 11 Building.  (D.E. 36-1, p. 4).

A UOF investigation was conducted at Step 1.  (D.E. 36-1, pp. 7-11).  Grievance Investigator T. McCullough characterized Plaintiff's complaint as "Major Gonzales spoke rudely."  (D.E. 36-1, p. 7).  However, he interviewed Defendant Metz who testified that, after Plaintiff repeatedly refused to tuck his shirt in, he ordered that he be placed in restraints.  (D.E. 36-1, p. 9).  Captain Metz could not recall "who arrived and placed the offender in restraints and escorted him to 11 Building.  No force was used."  (D.E. 36-1, p. 9).  Major Alaniz testified that the medical staff informed him that Plaintiff did not have a pass to excuse him from tucking in his shirt.  (D.E. 36-1, p. 8).  On August 7, 2012, Warden Monroe denied Plaintiff's Step 1 grievance.  (D.E. 36-1, p. 4).

On August 8, 2012, Plaintiff filed a Step 2 appeal of Grievance No. 2012189772.  (D.E. 36-1, pp. 5-6).  In his Step 2 grievance, Plaintiff complained that Major Gonzales had a history of retaliatory conduct toward him and that Gonzales had initiated and observed an excessive use of force by his subordinates.  (D.E. 36-1, p. 5).  Plaintiff pointed out that he had been seen by a UTMB neurologist and that all prison officials knew he was to limit the movement of his upper extremities, including the tucking in of his shirt; however, ever since he had been granted the right to wear a quarter-inch beard, prison officials, in particular Warden Davis, Warden Gonzales, and Captain Metz, through their subordinates, had found a new means to torment Plaintiff by requiring him to tuck in his shirt.  (D.E. 36-1, p. 5).  (*See also* D.E. 36-2, pp. 3-7, Offense Reports dated 1/28/12, 2/1/12, 2/6/12, 10/22/12, and 11/5/12, each charging Plaintiff with failing to obey an order for refusing to tuck his shirt in).  Plaintiff concluded that ordering him to wear his shirt tucked-in would result in "further significant injury."  (D.E. 36-1, p.6).

An investigation was conducted on Plaintiff's Step 2 appeal.  (D.E. 36-1, pp. 11-12).  The Step 2 investigation included Plaintiff's allegation against Captain Metz that he had used excessive force as well as his claim that Captain Metz and Major Gonzales had falsified Offense Reports against Plaintiff for (1) creating a disturbance; (2) threatening an officer; and (3) refusing to obey an order.  (D.E. 36-1, p. 12).  The investigating officer found no record of a disciplinary action on June 29, 2012, and no evidence to support Plaintiff's claims.  (D.E. 36-1, p. 12).  In addition, the matter was referred to the Office of the Inspector General (OIG) who declined to open an investigation based on insufficient evidence.  (D.E. 36-1, p. 12).  On October 15, 2012, Plaintiff's Step 2 grievance was denied.  (D.E. 36-1, p. 6).

### (3)    *Plaintiff's summary judgment response.*

In his response, Plaintiff counters that Defendant Metz used excessive force:

> …when he applied handcuffs behind his back ignoring [Plaintiff's] medical restriction on being cuffed in the front and purposely shoved Plaintiff into the metal pole, bashing his head twice against said pole.  The impact from the iron gate pole caused Plaintiff to experience dizziness, nauseated [sic] and a lingering headache after the use of force…lingering the entire weekend.  Plaintiff now suffers frequent migraine headaches.

(D.E. 41, p. 2).

Plaintiff continues that, at the time of the UOF, Defendant Metz knew that Plaintiff suffers from "severe disabilities," chronic pain and is restricted to sedentary

work.  (D.E. 41, p. 3).  His medical records show that he was prescribed a cervical collar and given a lay-in to wear a front zipper shirt.  (D.E. 41, p. 3).  He argues that there is a "material fact" as to whether or not his neurologist, Dr. Beale, ordered that he not be required to tuck his shirt in, and that neither Defendant, nor this Court, can speculate as to what the neurologist would testify.  (D.E. 41, pp. 4-5).  He states that another issue is whether Captain Metz personally interfered with Plaintiff's prescribed "specific" medical treatment when he handcuffed him behind his back.  (D.E. 41, p. 5-6).  Plaintiff concedes that he was violating TDCJ's rules by having his shirt untucked but that this violation posed no threat to Defendant Metz or any other persons.  (D.E. 41, p. 9).

Plaintiff points out that the medical records do not contain the recommendation of Dr. Beale or notes from that telemed appointment made by Mr. Webb that would prove Plaintiff should be able to wear his shirt untucked.  (D.E. 41, p. 10-11).  He argues that Defendant has failed to produce any evidence to establish that the force was applied in a good faith effort to maintain discipline, and that Defendant showed deliberate indifference to Plaintiff's serious medical conditions when applying the force.  (D.E. 41, p. 13).

As to his injuries, Plaintiff states that Lieutenant Todd, the officer who escorted him to medical, was aware of his injuries, and that at the infirmary, he was given only a "cursory examination," and asked a few questions, such as "Are you suicidal" "Are you currently taking meds?"  (D.E. 41, p. 13).  He states that he complained about a "marble-size" knot on his head, and that Nurse White-Roell examined it and commented "It's not

going to kill you," and released him to Lieutenant Todd to escort to PHD.  (D.E. 41, p. 14).  When he asked for Tylenol, he was told to submit a SCR.  (D.E. 41, p. 14).

In the remainder of Plaintiff's response, he again argues that a genuine issue of material fact exists as to whether he should have had a medical pass excusing him from wearing his shirt tucked in.  (D.E. 41, pp. 18-22).  However, he concludes that, regardless of this issue, there is no dispute that Defendant Metz inflicted harm on a non-resisting prisoner such that his actions may have violated the Eighth Amendment.  (D.E. 41, p. 25).

## IV.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the

matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.   DISCUSSION.

### A.   Eleventh Amendment immunity.

Plaintiff sued Defendant Metz in his official and individual capacities for monetary damages. Defendant moves for summary judgment to dismiss Plaintiff's monetary claims against him in his official capacity as barred by the Eleventh Amendment.  (D.E. 36, pp. 7-8).  However, those claims were previously dismissed as barred by the Eleventh Amendment on December 17, 2013, and need not be dismissed again.  (*See* D.E. 16, pp. 7-8).  There is no dispute that Plaintiff has no claim for monetary damages against Captain Metz in his official capacity.

### B.   Insufficient injury to support a claim of excessive force.

Defendant Metz moves for summary judgment on the grounds that either (1) there was no excessive force and Plaintiff suffered no physical injury such that his claim must be dismissed pursuant to 42 U.S.C. § 1997e(e); or (2) his injuries were *de minimis* such that he fails to state a cognizable Eighth Amendment violation.  (D.E. 36, pp. 6-7, 10-15).

### (1)   42 U.S.C. 1997e(e).

Section 1997e(e) states:

> No federal civil action may be brought by a prisoner for mental or emotional injury without a prior showing of physical injury.

42 U.S.C. § 1997e(e).  Section1997e(e) applies to all federal civil actions in which a prisoner alleges a constitutional violation, making compensatory damages for mental or emotional injuries non-recoverable, absent physical injury.  *Hutchins v. McDaniels,* 512 F.3d 193, 196 (5th Cir. 2007).

Defendant Metz argues there is no evidence to support Plaintiff's claim that a use of force even occurred on June 29, 2012.  In the Step 1 grievance investigation, Defendant testified that "No force was used."  (D.E. 36-1, p. 9).  There is no record of an official use of force being called on June 29, 2012.  (*See* D.E. 36-3, p. 2, Affidavit of Kathryn Bell, TDCJ Administrative Monitor for Use of Force, testifying that "after a diligent search," no Use of Force Report(s) had been located for Plaintiff pertaining to an incident on June 29, 2012.  In addition, there was no corresponding major disciplinary case filed against Plaintiff on that date to evidence that a use of force had been necessary. (*See* D.E. 36-2, Offense Reports filed against Plaintiff between January 1, 2012, through December 31, 2012).  Finally, Defendant argues that there is no evidence to suggest that Plaintiff suffered any injury: he was taken to the infirmary for PHD clearance and during that evaluation, he was found to have no lacerations, contusions, or bruises.  (D.E. 38, pp. 49-51).  In fact, Nurse White-Roell did not note a single complaint and released Plaintiff to PHD.  (D.E. 38. p. 51).  However, in his original complaint and summary judgment response, Plaintiff argues that he complained of a knot on his forehead but that Nurse Roell-White failed to document this injury.  He testified also that he complained to the escorting officer, Lieutenant Todd, that he felt dizzy and nauseated, but that he was told to submit a SCR for Tylenol after he arrived at 11 Building.  Taking the facts in the light

most favorable to Plaintiff, it cannot be said that, just because there is no record of the injury on June 29, 2012 following the PHD evaluation that Plaintiff was not injured. Nurse White-Roell did not record any injury in Plaintiff's medical file on that date, but Plaintiff claims that Defendant twice "slammed' his forehead into a steel pole. Thus, for purposes of 1997e(e), a genuine issue of material fact exists as to whether or not Plaintiff suffered an injury. Thus, it is respectfully recommended that Defendant's motion for summary judgment to dismiss pursuant to § 1997e(e) be denied.

(2)     A *de minimis* **injury.**

Defendant continues that, even if Plaintiff did suffer a physical injury on June 29, 2012, Plaintiff's medical records establish that the injury was *de minimis* as there are no records of Plaintiff seeking medical attention for the knot on his forehead, or complaining of the migraines he allegedly now suffers as a result of the incident, or any other objective medical evidence that would suggest Plaintiff suffered more than a *de minimis* injury on June 29, 2012.

Inmates have a constitutional right to be free from the use of excessive force. *See Anthony v. Martinez,* 185 Fed. Appx. 360, 363 (5th Cir. 2006). To state an excessive force claim, a plaintiff must show that the force was not applied in a good-faith effort to maintain or restore discipline, but was applied maliciously and sadistically to cause harm, and that the injury he suffered was more than *de minimis* but not necessarily significant. *See Hudson v. McMillian*, 503 U.S. 1, 6-7, 10, (1992). Thus, a prison official's "excessive physical force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury." *Id.* at 4; *see also Wilkins v. Gaddy,* 559

U.S. 34, 38 (2010) (reversing district court's dismissal of prisoner's excessive force claim based entirely on its determination that his injuries were "*de minimis*," reasoning that it was "at odds with *Hudson's* direction to decide excessive force claims based on the nature of the force rather than the extent of the injury.").   Additional relevant objective factors in the inquiry of the application of excessive force include (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response.  *Gomez v. Chandler*, 163 F.3d 921, 923-24 (5th Cir. 1999).

Although a *de minimis* injury is not cognizable, the extent of the injury necessary to satisfy the injury requirement "is directly related to the amount of force that is constitutionally permissible under the circumstances."  *Ikerd v. Blair*, 1010 F.3d 430, 434-35 (5th Cir. 1996) (citations omitted); *see also Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (noting that the minimum qualifying injury "changes with the facts of each case"); *Williams v. Bramer,* 180 F.3d 699,  704 (5th Cir. 1999) ("What constitutes an injury in an excessive force claim is ... subjective -- it is defined entirely by the context in which the injury arises.").  In general, the courts have concluded that the amount of injury necessary to satisfy the requirement of "some injury" and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.  *Williams,* 180 F.3d at 703-04.  Thus, courts may look to the seriousness of the injury to determine "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect

to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley v. Albers,* 475 U.S. 312, 321 (1986).  The Fifth Circuit has found an injury insufficient to support an excessive force claim where there is no physical injury, *see, e.g., Harper v. Showers,* 174 F.3d 716 719 (5th Cir. 1999), or where it is extremely minor.  *See Siglar v. Hightower,* 112 F.3d 191, 193 (1997) (bruise caused by having ear twisted considered *de minimis).*

Importantly for this case, the courts may look to the objective medical evidence available in helping to determine whether an alleged injury is more than *de minimis*. *Gomez,* 163 F.3d at 923.  For example, another court in this circuit has concluded that a "physical injury" in the context of excessive force "is an observable or diagnosable medical condition requiring treatment by a medical care professional."  *Luong v. Hatt,* 979 F. Supp. 481, 486 (N.D. Tex. 1997).  In that regard, a more than *de minimis* physical injury is not a sore muscle, aching back, scratch, abrasion, or bruise of the type that would not otherwise force a "free world person" to seek medical treatment.  *Id.*

In *Potts v. Hill,* 182 F.3d 913 (5th Cir. 1999) (per curiam) (unpublished), Potts alleged that a TDCJ correctional officer used excessive force against him, causing an injury to his mouth.  *Id.* at * 1.  The district court, relying on *Siglar,* concluded on summary judgment that Potts did not have the kind of injury that warranted Eighth Amendment protection.  *Id.*  On appeal, the Fifth Circuit reviewed Potts' verified medical records which documented the use of force.  *Id.*  The medical records established that Potts sustained a nonbleeding cut on the inside of his lip, and he claimed that he could not wear his dentures for three weeks following the altercation because his mouth was too

sore.  *Id.*  The Fifth Circuit agreed with the district court that there was no genuine issue of a material fact based on the *de minimis* nature of the injury and a corresponding disciplinary action against Potts that the force was applied in a good-faith effort to maintain and restore discipline, and not maliciously and sadistically to cause harm.  *Id.,* citing *Hudson,* 503 U.S. at 6-7.

In *Young v. Saint,* 990 F.2d 627 (5th Cir. 1993) (per curiam)(unpublished), prisoner Young alleged excessive force when Officer Saint, who was serving food, twice struck Young's hand with a metal spatula.  *Id.* at * 1.  Within fifteen to thirty minutes of the incident, Young was taken to the infirmary where his hand was examined.  *Id.* at * 2. Young's hand had an undetermined amount of blood and two small scratches on it.  *Id.* The scratches were cleaned, treated with an antibiotic ointment, and a band-aid applied. *Id.*  X-rays revealed no fractures, although a "slight decrease in flexion and extension" of Young's fingers was noted a few days after the injury occurred.  *Id.*  at * 1.  Young's request for a prescription pain killer was denied, but he was prescribed an over-the-counter pain reliever.  *Id.* at * 2.  Despite Young's repeated complaints of pain, he was forced to engage in his manual labor prison job during the days following the incident. *Id.*  The Fifth Circuit affirmed the magistrate judge's dismissal of Young's case as frivolous pursuant to 28 U.S.C.  § 1915(d) finding that there is no actionable Eighth Amendment violation when the injuries suffered by the prisoner are the result of a *de minimis* use of force that is not "repugnant to the conscience of mankind."  *Id.* at * 3.

In *Richardson v. Simmons,* 2009 WL 689888, *9 (S.D. Tex., Mar. 11, 2000) (unpublished), the plaintiff/prisoner alleged that he was badly beaten and that the

defendant officers had slammed his head into the wall and the top of his bunk. *Id.* However, the Galveston court determined that Richardson had refused to follow orders and was belligerent, and that the officers had applied no force greater than was necessary to control Richardson and bring him to the ground. *Id. at *7.* As he was escorted to medical, Richardson first struggled, then went limp, and the officers found it necessary to drag him by his upper arms. *Id.* At medical, the nurse noted that Richardson was screaming and yelling, but he had no injuries to his head nor did he allege that he had been beaten by the officers. *Id.* at *8 He was examined a second time that same day and it was noted that had had calmed down. *Id.* Six days later, Richardson complained about shoulder and wrist pain, as well as a throbbing headache. *Id.* The nurse observed "no pain or trauma upon palpation" of Richardson's head. *Id.* The nurse ordered a shoulder x-ray and prescribed Ibuprofen. *Id.* The Galveston court concluded that Richardson's injuries were to be expected with the amount of reasonable force the defendants were required to employ in escorting him against his wishes, and that the objective medical evidence refuted his allegations that he had been beaten or sustained a serious injury to his head. *Id.* at * 9.

> (a)     *Plaintiff's injury is de minimis.*

The above case law makes clear that, to succeed on an Eighth Amendment excessive force claim, a prisoner must have suffered more than a *de minimis* injury from the excessive force. *Gomez,* 163 F.3d at 924. Here, Plaintiff claims that Defendant Metz twice slammed his head into a steel pole causing a "marble-sized knot" to rise on his forehead. However, he was escorted to medical within ten minutes of the alleged

excessive force, and Nurse White-Roell found no contusions, lacerations or bruises that would have been expected based on Plaintiff's description of the force.  (*See* D.E. 38, pp. 49-51).  Plaintiff complains that Nurse White-Roell's examination of him was "cursory;" however, he admits that his blood pressure and temperature were taken, and he was questioned, and able to respond to questions.  (D.E. 41, p. 13).  Plaintiff's blood pressure was normal and not indicative of an individual who had recently been assaulted by having his head slammed twice into a metal pole.  He was able to answer the nurse's questions, and he did not complain to her that he had been assaulted by Defendant Metz.  (D.E. 38, pp. 49-51).  He claims that he did point out the bump that was forming on his forehead and that Nurse White-Roell dismissed it and told him to submit a SCR for Tylenol once he got to PHD.  However, assuming this is true and Nurse White-Roell failed to document properly the injury to Plaintiff's forehead, Plaintiff did not submit a SCR for Tylenol or to see the doctor later that day, or the next day, or later that week, or that month, or any time that year concerning the alleged injuries he suffered on June 29, 2012.  (*See* D.E. 38).  Although Plaintiff states that he now suffers from migraines as a consequence of Defendant Metz's actions, for the six months following the incident, he never filed a SCR complaining of migraines or head trauma to a medical provider in any of his subsequent appointments.  (D.E. 38).  That is, despite his allegation of more than a *de minimis* injury, there is no objective medical evidence to support Plaintiff's claim that he suffered any injury.  Taking his allegations as true, that his head was hit against the pole, his subsequent actions suggest that the injury itself was no more than *de minimis* because he did not require nor seek medical attention for his head.

(b)        *The force was not repugnant or malicious.*

The inquiry of a use of force claim does not end with an analysis of the injury that was suffered.  *See Baldwin v. Stadler,* 137 F.3d 836, 839 (5th Cir. 1998) ("the absence of serious injury is quite relevant to an excessive force inquiry, but does not alone preclude relief," citing *Hudson,* 503 U.S. at 7).  The core inquiry is always "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson,* 503 U.S. at 6-7.  Indeed, the Fifth Circuit has specifically noted that "*Siglar* leaves open the possibility that a physical injury which is only *de minimis* may nevertheless suffice for purposes of the Eighth Amendment … if the force used is the kind [that is] repugnant to the conscience of mankind." *Gomez,* 163 F.3d at 924 n. 4 (internal quotations omitted).

Here, Plaintiff admits that he did not have his shirt tucked in and he did not have a pass to wear his shirt untucked.  Although he claims that his untucked shirt had not been a problem until that day, his Offense Report records show that he was in fact written up three times prior to June 29, 2012 for refusing to tuck in his shirt.  (*See* D.E. 36-2, pp. 5-7, Offense Reports dated January 28, 2012, and February 1, and 6, 2012).  Plaintiff further does not dispute that Defendant Metz afforded him several chances to tuck his shirt in, but he refused to do so.  Plaintiff was then instructed to submit to handcuffs. Plaintiff argues that Defendant violated his medical restrictions when he placed him in double handcuffs behind his back rather than handcuffing him in front; however, in his original complaint, he suggests that Defendant *almost* violated his medical restrictions until Lieutenant Todd linked his handcuffs together with Defendant's making it double

cuffs.   Regardless, even if Defendant violated Plaintiff's medical restrictions by mistakenly handcuffing him in back with double cuffs rather than in front, Plaintiff does not claim that he suffered any physical injury from this action.  Moreover, in the context of Plaintiff refusing to obey an order, Defendant's actions of ordering Plaintiff to submit to handcuffs and then placing him in such does not suggest malicious or sadistic conduct but only an attempt to restore and maintain discipline.  *See e.g. Davis v. Cannon,* 91 Fed. Appx. 327, *1 (5th Cir. 2004) (per curiam) (unpublished) (no excessive force where guard threw prisoner to ground and used chemical agent in light of prisoner's repeated refusal to obey orders); *Martin v. Seal,* 2014 WL 2890125, *5 (E.D. La. 2015) (in the face of continued disobedience, application of some force is necessary and officers are not required to "'wait prisoner out"); *Moreno v. Saldana,* 2007 WL 3342205 (S.D. Tex. 2007) (unpublished) (where inmate refused to return to his dormitory, a security risk arises and defendant was authorized to use mace to restore order).

Plaintiff argues that his refusal to tuck in his shirt did not pose a security risk to Defendant or to the prison, such that any force was unreasonable; however, the courts have consistently acknowledged that prison officials have the authority to enforce even the most seemingly mundane rules to maintain order and discipline.  In *Martin, t*he Louisiana district court noted:

> When an order is given to an inmate there are only so many choices available to the correctional officer.  If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.  While experts who testified on behalf of the

plaintiffs, suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide for the care, safety and security of the staff and inmates. Service to provide food, clothing, health, medical, cleaning, laundry and all other services would come to an end without discipline. Mob rule would take over. There would not be, and could not, be any protection for staff or inmates. ***Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.*** Someone must exercise authority and control. One can quickly reason what would happen in a maximum security prison without proper discipline.

*Id.* at * 5 (emphasis added).

The fact that Defendant had ordered Plaintiff simply to tuck in his shirt still falls within orders to maintain order and discipline, and Plaintiff's admission that he repeatedly refused to follow such orders justifies Defendant Metz's decision to employ force.

In his Step 1 grievance, Plaintiff maintained that he never resisted the officers or made any threats against them, but refused to violate his prescribed medical treatment, causing Defendant to use excessive force. (D.E. 36-1, pp. 3-4). However, in his Step 2 appeal, Plaintiff failed to even raise the alleged UOF, but instead, argued that he is medically entitled to not tuck his shirt in. (D.E. 36-1, pp. 5-6). As in his response,

Plaintiff focuses on a March 29, 2012 telemed appointment with Dr. Beale to argue that he should not be required to tuck his shirt in and that all prison officials are aware of this restriction, but continue to give him disciplinary cases for wearing his shirt untucked. (D.E. 36-1, p. 5).

Despite Plaintiff's argument to the contrary, Dr. Beale's medical opinion concerning whether or not Plaintiff should have a medical pass to wear his shirt untucked is not relevant to the events of June 29, 2012. The uncontested facts establish that on that date, Plaintiff did not have a medical pass to wear his shirt untucked. Despite not having permission to do so, and despite having been written up for this offense in the past, Plaintiff continued to disobey the TDCJ regulation when he so desired. When he was instructed to tuck his shirt in, he refused to do so, in direct defiance of Defendant's orders. Under the undisputed facts of this case, Captain Metz was authorized to use physical force to restrain Plaintiff and then have him escorted him to PHD. Further, the force employed was *de minimis* as evidenced by the fact that Plaintiff never sought medical attention following the UOF for his alleged head injuries.

## VI.    RECOMMENDATION.

For the reasons stated above, it is respectfully recommended that Defendant's motion for summary (D.E. 36) be granted, and that Plaintiff's excessive force claim against Captain Metz be dismissed with prejudice.

Respectfully submitted this 8th day of May, 2015.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).